UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:

                                                              Case No. 812-71471-reg

BC FUNDING, LLC,

                                                              Chapter 11

                              Debtor.

---------------------------------------------------------------x
BC LIQUIDATING, LLC,

                              Plaintiff,                       Adv. Proc. No. 814-8082-reg

vs.

LLOYD J. WEINSTEIN, THE WEINSTEIN GROUP, P.C.,
KAREN SHARF, HUNT ASHLEY GROUP, INC.,
sometimes doing business as SECRET GARDENS,
SAMANTHA SHARF, MITCHELL C. ELMAN,
THE LAW OFFICES OF MITCHELL C. ELMAN, P.C.,
TIX GROUP, LTD., MERCY ROMAN,
ANDREW MUHLSTOCK, MUHLSTOCK &
ASSOCIATES, CPA's PLLC, ERICA ABRAMSON,
as TRUSTEE OF BC FUNDING HOLDINGS TRUST,
BC FUNDING HOLDINGS TRUST, and ERICA
ABRAMSON, as TRUSTEE OF THE BARRY SHARF
2002 TRUST and THE BARRY SHARF 2002 TRUST,

                              Defendants.

---------------------------------------------------------------x

## DECISION

    The Plaintiff, BC Liquidating, LLC ("Plaintiff" or "BC Liquidating"), is a limited

liability company established by the Lenders' Third Amended Plan of Liquidation ("Plan") for

the Debtor, BC Funding, LLC ("BCF"), confirmed by Order, dated January 22, 2013

("Confirmation Order").  BC Liquidating's stated purpose is to liquidate and distribute assets of

the bankruptcy estate, including certain causes of action, for the benefit of the estate's creditors.

Pursuant to the authority given to it by the Plan and Confirmation Order, BC Liquidating

commenced this adversary proceeding against multiple defendants alleging that they engaged in

a massive fraud orchestrated by BCF's CEO, Barry Sharf, to loot the assets of BCF eventually leading the company into bankruptcy.

As alleged in the Complaint, dated March 13, 2014 ("Complaint"), Sharf, in concert with the Defendants, fraudulently elicited investments of over $7 million from third parties that while ostensibly for BCF were really intended to be used by Sharf and the other Defendants for their personal gain. The Plaintiff alleges that Sharf and the Defendants then diverted BCF assets through the escrow account of the company's lawyer to numerous affiliated or controlled entities where the funds were then distributed for the Defendants' personal use and to the detriment of BCF. The causes of action asserted in the Complaint include RICO violations, fraud, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, aiding and abetting conversion, unjust enrichment, constructive trust, accounting, preferences, fraudulent transfer, and disallowance of claims.

The Plaintiff's standing to bring these causes of action derives from two separate sources: the Plaintiff asserts the causes of action for RICO violations, fraud, aiding and abetting fraud, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, as assignee of those claims from Harrison Trading Investments, LLC ("HTI") and Steven Khan ("Khan"), both pre-petition investors in the Debtor's business (the "Lender Causes of Action"); the remainder of the causes of action, i.e., for conversion, aiding and abetting conversion, unjust enrichment, constructive trust, accounting, preferences, fraudulent transfer, and disallowance of claims were assigned to the Plaintiff by the Debtor pursuant to the confirmed Plan (the "Debtor Causes of Action").

Before the Court are several related motions to dismiss the Complaint, filed by (1) Lloyd Weinstein and The Weinstein Group (the "Weinstein Defendants"), (2) Karen Sharf and Hunt

Ashley Group, Inc., sometimes doing business as Secret Gardens (together Hunt Ashley Group, Inc., and Secret Gardens are referred to herein as "HASG"), (3) Samantha Sharf,[1] (4) Mitchell C. Elman, the Law Offices of Mitchell C. Elman, P.C., and TIX Group, LTD (the "Elman Defendants"), (5) Andrew Muhlstock and Muhlstock & Associates, CPAs PLLC (the "Muhlstock Defendants"), (6) Erica Abramson, as Trustee of BC Funding Holdings Trust, and Erica Abramson, as Trustee of the Barry Sharf 2002 Trust, and (7) Mercy Roman ("Roman").[2] Although each of the motions asserts slightly different variations on the law and the facts as applied to each Defendant, the motions taken as a whole seek to dismiss the Complaint: (a) for pleading deficiencies pursuant to Fed. R. Civ. P. 12(b)(6), 8 and 9(b); (b) on the basis that the assignment of the Lender Causes of Action to the Plaintiff was not valid; and (c) that the Plaintiff lacks standing under the so-called *Wagoner* Rule in effect in this Circuit and/or the doctrine of *in pari delicto*.

For the reasons stated more fully below, the Court finds that the Lender Causes of Action were properly assigned to BC Liquidating and that BC Liquidating has the authority to bring the claims asserted in the Complaint. The Court also finds that since the Lender Causes of Action are being brought by the Plaintiff on behalf of creditors, i.e., not derivative of the Debtor's standing, those claims are not barred by either the *Wagoner* Rule or *in pari delicto*. The Court further holds that the Debtor Causes of Action do not require any complicity or bad acts by the Debtor and thus do not fall under the framework of either *Wagoner* or *in pari delicto*.

Finally, the Court denies the motions to dismiss the Complaint pursuant to Fed. R. Civ. P. 8, 9 and 12(b)(6). As explained in more detail below, the Plaintiff alleges causes of action upon

---

[1]    The claims against Samantha Sharf, Barry Sharf's daughter, were voluntarily dismissed without prejudice by Stipulation and Order, dated September 17, 2014. [Dkt # 119].
[2]    The motions to dismiss by Erica Abramson, as Trustee of BC Funding Holdings Trust, and Erica Abramson, as Trustee of the Barry Sharf 2002 Trust, and by Mercy Roman will not be addressed in this Decision.

which relief can be granted, and satisfies the pleading standards of Rules 8 and 9 with respect to each of those causes of action. Although all of these very serious allegations remain to be proven at trial, the Court finds the allegations to be sufficient at this preliminary pleading stage.

## THE ALLEGATIONS OF THE COMPLAINT

Barry Sharf and Kenneth Alpert ("Alpert"), the sole owner of Harrison Trading Investments, LLC ("HTI"), formed BCF in December of 2007, (Compl. ¶ 44), as a limited liability company under the control and direction of its parent company, BC Funding Holdings LLC ("BC Holding"). (Limited Liability Company Agreement of BC Funding LLC ("BC Funding LLC Agreement"), December 7, 2007, § 3.1). The business of BCF was to provide short term cash advances to merchants in need of liquidity and in return receive an assignment of the merchant's credit cards and other receivables. (Compl. ¶ 3).

At formation, HTI agreed to provide a $1,500,000.00 secured loan to BCF in exchange for 40% equity ownership of BCF's parent entity, BC Holding, with the remaining 60% ownership of BC Holding being held by BC Funding Trust.[3] (Compl. ¶¶ 40-41, 46). The HTI loan agreement, executed on June 16, 2008, provided for installment payments by HTI to BCF from December 12, 2007 to May 27, 2008. (Compl. ¶ 50). As part of that transaction Sharf was required to loan $300,000.00 to BCF, which could only be recouped after HTI's loan was fully repaid. (Compl. ¶¶ 42-43).

Barry Sharf served as Chief Executive Officer and Manager of BCF from 2007 until 2012. (Compl. ¶¶ 12, 16). From 2008 to 2011, BCF raised over $7,000,000.00 from investors, including Steven Khan and HTI. (Compl. ¶¶ 4, 145-200). According to the Plaintiff, Sharf withdrew his original $300,000 loan from the company, allegedly without consent from HTI,

---

[3]       HTI's ownership would later increase to 50%. (Compl. ¶ 46).

(Compl. ¶ 63), and, aided by the Defendants, embezzled and misappropriated hundreds of thousands of dollars to fund a lavish lifestyle for himself and his family, ending only when BCF filed bankruptcy in 2012.  (Compl. ¶ 12).  Sharf and the Defendants allegedly looted the company of at least $2,300,000.00 (Compl. ¶¶ 68, 69, 82, 93, 95-102, 104, 127).[4]

Defendant, Lloyd Weinstein ("Weinstein"), was a manager of BC Holding along with Barry Sharf.  (Limited Liability Company Agreement of BC Funding Holdings, LC ("BC Holding LLC Agreement") June 16, 2008 § 4.6).  In Weinstein's capacity as Manager of BC Holding he signed, along with Alpert from HTI, Sharf's employment agreement installing Sharf as CEO.  (Compl. ¶¶ 57-59; Employment and Non-Compete Agreement ("Employment Agreement"), June 16, 2008 at 9).  Sharf's employment agreement included a provision that he was not to receive any annual compensation until certain funding benchmarks were reached.  (Compl. ¶ 59; Employment Agreement § 3).  The Plaintiff alleges that Weinstein also served as general counsel for BCF and provided legal services to BCF through his law firm, The Weinstein Group ("TWG").  (Compl. ¶¶ 17, 61).  Weinstein is the sole shareholder and President of TWG.  (Compl. ¶ 18).

Shortly after the formation of BCF, Sharf caused the company to engage Andrew Muhlstock ("Muhlstock") and Muhlstock & Associates, CPA's, PLLC ("Muhlstock & Associates") as accountants for the company.  (Compl. ¶ 60).   Sharf also retained Mitchell Elman ("Elman") as a special counsel and Vice President of BCF.  (Compl.  ¶¶ 22, 167).  In addition Sharf, on behalf of BCF, executed consulting contracts with TIX Group ("TIX"), which Elman controlled as the sole shareholder and president.  (Compl. ¶ 24).  Elman is also the sole shareholder and president of the Law Offices of Mitchell Elman, P.C. ("LOME") (Compl. ¶ 23).

---

[4]    In addition to these identified payments and transfers Plaintiff alleges there is additional financial activity that is not currently known and in order to discover the full extent of such activity further discovery is required.

On March 13, 2012, BCF filed for chapter 11 bankruptcy and during the case the assets

of BCF were sold to Strategic Funding Sources.  (Compl. ¶¶ 13, 201).  On April 12, 2013, Sharf

personally filed for chapter 7 bankruptcy.[5]  (Compl. ¶ 202).  As part of the confirmed chapter 11

Plan, the Court approved the formation of the Plaintiff, BC Liquidating.  (Confirmation Order ¶

17).  BC Liquidating has all the powers of a debtor in possession, and was assigned any and all

causes of action held by BCF.  (Limited Liability Company Agreement of BC Liquidating

("LLC Agreement"), Jan. 17, 2013 §§ 2.4, 4.1).  On March 12, 2014, Khan and HTI assigned all

of their claims and causes of action to BC Liquidating.  (Compl. ¶¶ 34-35).  BC Liquidating then

commenced the instant adversary proceeding.

To support the allegations that the Defendants engaged in a massive fraudulent scheme to

loot the assets of the company, the Plaintiff alleges the following facts:

1. Between 2007 and 2011 BCF transferred $751,765.01 to Hunt Ashley and from 2008 to 2011 BCF transferred $281,308.56 to "Secret Gardens." (Compl. ¶¶ 68-69). HASG are jointly owned by Barry Sharf and his wife, Karen Sharf. While the payments were allegedly "consulting fees" and "commissions" the Plaintiff alleges that HASG did not engage in any consulting work and has failed to provide any contracts or agreements to indicate otherwise. (Compl. ¶¶ 70-74). The Plaintiff alleges that at all times Karen Sharf was aware of this scheme and was an active participant. (Compl. ¶ 75).

2. Sharf used at least $753,324.12 from BCF to subsidize a lavish lifestyle for himself and his family without benefit to the company. (Compl. ¶ 82; Schedule C). Specifically BCF paid $110,917.44 to restaurants, $57,436.68 for car payments, $21,588.61 for Sharf and his family's vacation, $16,300.00 for personal dentistry, $23,012.27 in alcohol, flowers, and clothing, $24,188.21 for cellular phone usage, and $7,538 to Sharf's synagogue. (Compl. ¶¶ 78-80). In addition Sharf withdrew $328,247.21 in cash from BCF. (Compl. ¶ 81).

3. Sharf utilized Weinstein to assist in diverting BCF assets for Sharf's personal use. In January 2009, Sharf and Weinstein used Weinstein's law firm, TWG, to create an escrow account for BCF. (Compl. ¶ 89). According to the Complaint the escrow

---

[5]     Barry Sharf is not a named Defendant in this action.  The Plaintiff has filed a separate complaint in Sharf's individual bankruptcy proceeding alleging, among other things, claims for violation of the RICO Act, fraud, breach of fiduciary duty, fraudulent conveyances, preferences, and objections to discharge and dischargeability.  (Adv. Proc. No. 14-8084).

account's purpose was to launder funds from BCF to Sharf and to hide those transactions. (Compl. ¶¶ 89-90). For example, the Plaintiff alleges payment from the escrow account in the amount of $97,812.75 to Wells Fargo for Sharf's personal home mortgage, payments of $9,250 to Camp Greylock for Sharf's son's summer camp, and $10,000 to pay Sharf's personal American Express bill. (Compl. ¶¶ 93-95, 104). In addition over $60,000 was transferred from the escrow account to pay for the bar mitzvah of Hunter Sharf (Barry and Karen Sharf's son) (Compl. ¶¶ 96-102), including $5,000 for an event planner, $38,783.54 for the restaurant, $7,500 for flowers, $7,000 for entertainment, $1,900 for transport, and $1,533.77 for brunch the next day. (Compl. ¶¶ 96-102).

4. Weinstein also allegedly transferred approximately $30,000 from BCF to his own consulting company, BeeSwing Consulting for no consideration. ("BeeSwing"). (Compl. ¶ 107).[6]

5. The Plaintiff alleges that Weinstein and TWG maintained and prepared two sets of books with regard to the escrow account in order to conceal certain transactions. (Compl. ¶ 108). The Plaintiff asserts that certain payments present on the un-redacted set, such as a $7,500 payment to Wells Fargo and a $5,000 payment to Hunt Ashley, do not appear on the redacted set of books. (Compl. ¶ 114; Exhibit E, F).

6. In September of 2009 Sharf had BCF sign consulting agreements with TIX to assist BCF in raising capital. (Compl. ¶¶ 124-25). In exchange for these alleged services TIX received $340,551.16 from BCF. (Compl. ¶ 127). However Plaintiff alleges that there is no evidence that TIX actually conducted any capital raising services. (Compl. ¶¶ 126-31). In addition BCF made eight (8) interest free loans, totaling $21,600.00, to TIX between April 1 and October 1, 2011. (Compl. ¶ 134-44). While the loans were almost entirely paid back, only $5,000 appears to be outstanding, Plaintiff alleges that the purpose of the loans was to launder or disguise misappropriated money. (Compl. ¶¶ 135-44).

7. The Plaintiff alleges that the Muhlstock Defendants purposefully misrepresented financial records and intentionally disguised transfers on BCF's financial statements as ordinary business expenses such as "consulting fees," "commissions," and "legal fees." (Compl. ¶¶ 84-86). Muhlstock did this by creating allegedly fraudulent audits for 2008 and 2009. (Compl. ¶¶ 151-53, 188-89). The 2008 audit incorrectly stated that sales revenue from BCF was $9,334,915.00 and net income was $189,850.00, when in actuality sales revenue was much lower and there was no net income at all, only a net loss. (Compl. ¶¶ 153-55). Plaintiff maintains that the 2009 audit also inflated sales revenue and net income while limiting BCF's debt when the audit described BCF sales revenue at $9,590,573.00, net income at $74,519.00, and BCF's bad debt at $508,718.00. (Compl. ¶¶ 189-91). According to the Complaint these financial statements were given to prospective investors, i.e., HTI and Khan, to

---

[6]    The alleged transfers to BeeSwing are the subject of a separate adversary proceeding – Adv. Proc. No. 14-8059. (See also Compl. Exhibit D).

induce them to either further invest, or begin investing, in BCF and that the investors relied on these audits. (Compl. ¶¶ 150-57, 176-200).

8.  In order to continue the Defendants scheme to loot BCF additional funds were required and so Sharf began to solicit investors, including HTI, by providing them with fraudulent financial information about BCF. (Compl. ¶¶ 145-59). After Alpert received a Profit & Loss Statement for January through May 2008 which inflated BCF's total income and net income, HTI transferred an additional $1,000,000.00 via wire and checks to BCF during a period of July 22, 2008 to November 10, 2008, (Compl. ¶¶ 145-49). In reliance upon receipt of the allegedly fraudulent 2008 audit, HTI transferred another $560,000.00 to BCF on November 16, 2009. (Compl. ¶¶ 150-57). In total, between July 22, 2008 and November 16, 2009, HTI invested $1,560,000.00 into BCF (Compl. ¶ 158).

9.  Elman also assisted Sharf in soliciting additional funds from investors such as Khan by knowingly using incorrect financial information in order to paint an inaccurate financial picture of BCF. (Compl. ¶¶ 161-98). On January 19, 2010 Elman and Sharf met with Khan to seek such additional investment. (Compl. ¶¶ 163, 173). The Plaintiff alleges that Elman, who represented himself to Khan as an owner of BCF, was the one who organized the meeting. (Compl. ¶¶ 161-62). Before the meeting, Khan received an email from Sharf and Elman that included BCF's Executive Summary. (Compl. ¶¶ 164-65). According to the Plaintiff the Executive Summary mischaracterized BCF's business plan, income, funding, and profit margins in order to hide BCF's poor financial condition. (Compl. ¶¶ 165-72).

10. At the meeting Sharf and Elman discussed BCF's business plan and financials with Khan. (Compl. ¶¶ 173-74). The Plaintiff alleges that Elman and Sharf supplied Khan with incorrect and fraudulent information. (Compl. ¶¶ 173-85). Specifically that Khan was told that BCF's default rate was 6%, when in actuality it was nearly 20%, that any loan he made would have priority when in fact the original HTI loan was senior to any other subsequent loan, and that there was no pending litigation, when in fact there was. (Compl. ¶¶ 175, 182-85). Elman and Sharf also provided the allegedly false 2008 audit to Khan. (Compl. ¶¶ 176-78). After the meeting on February 25, 2010, in reliance on the above information, Khan transferred $500,000.00 to BCF. (Compl. ¶ 186).

11. In July of 2010, Sharf approached Khan for another loan. (Compl. ¶ 193). From April 1, 2010 through August 1, 2010 Khan visited BCF's headquarters to learn how BCF functioned and during that time was given the 2009 audit created by Muhlstock & Associates. (Compl. ¶¶ 187-91). The Plaintiff also alleges that Sharf inaccurately told Khan that BCF had a cash position of $600,000. (Compl. ¶¶ 194-96). On August 3, 2014 Khan made a second transfer to BCF in the amount of $500,000. (Compl. ¶ 197).

12. Between January and May of 2011, Plaintiff alleges that Sharf continued to solicit loans from other investors through the use of fraudulent financial information about

BCF.  (Compl. ¶¶ 199-200).  Specifically, Plaintiff alleges that Sharf provided these investors with misleading statements, false financial records, and inaccurate books.  (Compl. ¶ 199).  From January 1, 2011 to May 15, 2011 six different investors provided $1,430,000.00 to BCF.  (Compl. ¶¶ 199-200).

# DISCUSSION

1. *Standing*

    a. *Power and Authority of BC Liquidating*

The Plaintiff, in part, cites to Bankruptcy Code sections 323(b) and 704(a)(1) in support of its authority to bring the causes of action asserted in this adversary proceeding.  (Plaintiff's Memorandum of Law in Opposition to the Elman Defendants' Motion to Dismiss, July 9, 2014, Dkt. 76, at 20).  Section 323 states that a "trustee in a case under this title is the representative of the estate. . . .  [] and has capacity to sue and be sued."  11 U.S.C. §323(a), (b).  Section 704 sets forth the "duties of a trustee" and requires that a trustee "collect and reduce to money the property of the estate for which such trustee serves . . . ."  11 U.S.C. §704(a)(1).

However, the Plaintiff is not *per se* a trustee in bankruptcy.  Rather, the Plaintiff is a "representative of the estate" as that term is used in section 1123(b)(3)(B).  Section 1123(b)(3)(B) provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or [] the retention and enforcement by the debtor, by the trustee, *or by a representative of the estate appointed for such purpose*, of any such claim or interest…."  The use of three distinct terms, "the debtor," "the trustee," and an appointed "representative of the estate" suggest that the "representative of the estate" is not the same as a "trustee."  Indeed, as recently articulated by the Second Circuit in *United States v. Bond,* 762 F.3d 255, 257 (2d Cir. 2014), the authority of a "representative of the estate" appointed pursuant to a confirmed plan, such as the Plaintiff here, is distinct from that of a

trustee in bankruptcy.  The authority and power of a trustee or debtor-in-possession, as those

terms are used in the Bankruptcy Code, derives from the Bankruptcy Code whereas the authority

and power of an estate representative appointed pursuant to section 1123(b)(3) derives solely

from the confirmed plan, confirmation order, and any operative documents adopted by reference

into the plan and confirmation order.  *Id.*  In *Bond*, the Circuit Court found that a bankruptcy

court can "assign to an appointed estate representative powers that 'the trustee' possesses under

the Code." *Id.* at 262.  ("A plan may provide for the retention and enforcement…by a

representative of the estate appointed for such purpose of any such claim or interest."); *see also*

*Matter of Texas General Petroleum Corp.* 52 F.3d 1330, 1335 (5th Cir. 1995) ("[A] party other

than the debtor or the trustee may be authorized by a plan of reorganization to exercise avoidance

power").  The bankruptcy court cannot, however, "through confirmation of a reorganization plan

expand its own jurisdiction." *Bond,* 762 F.3d at 261.

Consistent with *Bond*, the Court finds that the powers and duties bestowed upon the

Plaintiff, BC Liquidating, by the confirmed Plan, the Confirmation Order and the LLC

Agreement—which was specifically approved by the Confirmation Order—provide the sole

guidance for the Plaintiff's authority to prosecute the subject causes of action.  Thus, as a

threshold matter the Court must discern whether the operative documents gave the Plaintiff the

proper authority to bring these claims.

BC Liquidating is defined in the Plan as a "limited liability company to be organized

under the laws of the State of New York to undertake and consummate the actions contemplated

by the Plan and the LLC Agreement."  (Plan Art. I § 1.16).  The Plan gives BC Liquidating "all

rights, powers and obligations set forth in the Plan and the BC Liquidating LLC Agreement."

(Plan Art. VII(A)).  Those powers include the right to pursue certain "Causes of Action" as that

term is defined in the Plan. (Plan Art. VII(D)). The Plan also provides that "any and all Causes of Action shall remain assets of the Estate" and "shall be assigned, transferred to and vested in BC Liquidating." (Plan Art. V(C)). The Plan also specifically creates a Management Committee for BC Liquidating and bestows upon that committee the ability to "commence[] and prosecute [] any Causes of Action, pursuant to the terms of the LLC Agreement." (Plan Art. V(A)).

The LLC Agreement, expressly adopted by this Court through the Confirmation Order, is another source from which the powers and duties of BC Liquidating are derived. (Confirmation Order § 16). The LLC Agreement provides that BC Liquidating was formed to "prosecute, settle, collect, liquidate and/or distribute the Assets in such a manner so as to maximize the proceeds." (LLC Agreement - LLC Recital at 1). The LLC Agreement also provides that BC Liquidating can "exercise all rights and powers of a debtor-in-possession under section 1107 of the Bankruptcy Code with respect to the Causes of Action" as defined in the LLC Agreement. (LLC Agreement § 2.4).

The Court finds that the Plaintiff, BC Liquidating, was given the *powers* of a debtor-in-possession through the ratification of the LLC Agreement by the Court.

      *b.   Assignments to the Plaintiff - The Lender Causes of Action*

Regardless of the Plaintiff's general authority to assert claims on behalf of the estate, the moving Defendants argue that the Lender Causes of Action must be dismissed because BC Liquidating did not receive a proper assignment of those claims from HTI and Kahn. Specifically, the Defendants allege that the assignments from HTI and Kahn are (i) not authorized by the Plan, (ii) did not include claims against third parties, and (iii) are, in any event

untimely since they were not assigned within the 30-day window specified by the Plan.  The

Defendants' arguments fail on all counts.


i.       *The assignments by HTI and Kahn were authorized by the Plan*

The Defendants contend that the Plaintiff did not have the authority to accept an

assignment of the Lender Causes of Action from HTI and Khan, that neither the Plan nor the

LLC Agreement could be modified to provide such authority, and that even if such authority was

granted Plaintiff does not have the power to prosecute the assigned causes of action.  (Elman

Reply Memorandum in Support of Motion to Dismiss ("Elman Reply Mem."), August 20, 2014

Dkt. 91, at 4).

Defendants' first point is that BC Liquidating cannot accept assignment of causes of

action from HTI and Khan based on the language in Article V(C) of the Plan.  Namely the

Defendants argue that the Plaintiff only has the authority to bring "Causes of Action in the name

of the Plaintiff, 'the Debtor and/or the Estate'" and cannot bring causes of action on behalf of

any other parties.  (Elman Reply Mem. at 3, citing Article V(C)).  The Court disagrees with the

Defendants' reading of the Plan.  First, the Court can find no language in the Plan or LLC

Agreement prohibiting the Plaintiff from accepting an assignment of causes of action from HTI

and Khan.  Article V(C) of the Plan —which refers to Plaintiff's standing to pursue causes of

action in the name of the Plaintiff, the Debtor *and/or Estate*—does not include any language

*prohibiting* assignment of causes of action from creditors.  Article V(C) authorizes the Plaintiff

to pursue causes of action in the name of the "Estate," referring to the bankruptcy estate, which

is broadly defined under section 541 of the Code "to encompass all kinds of property including

intangibles."  *In re Bogan*, 414 F.3d 507, 512 (4th Cir. 2005).  This broad construction has

"uniformly been interpreted to include causes of action."  *Pollis v. Getaways, Inc*, 217 F.3d 899, 901 (7th Cir. 2000).  Section 541(a)(7) includes within property of the estate "any interest in property that the estate acquires after the commencement of the case."  This broad definition of "Estate" and estate property would include the causes of action assigned by HTI and Khan, and the Court finds that Article V(C) does not prohibit the Plaintiff from accepting such assignment.  The LLC Agreement does not conflict with this interpretation of the Plan.  The LLC Agreement describes the purpose of BC Liquidating this way:

> in the exercise of its reasonable discretion (i) enforce, pursue, make a demand on, sue upon, settle or comprise any or all Causes of Action…(ii) exercise all rights and powers of a debtor-in-possession under Section 1107 of the Bankruptcy Code with respect to the Causes of action, (iii) *collect, liquidate, distribute, sell, transfer, assign, or otherwise dispose of the Assets*…"

LLC Agreement § 2.4 (emphasis added).

"Assets" is defined in the LLC Agreement as "*all* assets of the Debtor constituting property of the Estate pursuant to section 541 of the Bankruptcy Code, written-off Receivables Proceeds, … *Causes of Action* (LLC Agreement § 1.1 at 2, emphasis added).  The only limitation on Assets is that "the term 'Assets' shall *not* include the Sale Proceeds or the Sale Claims." (LLC Agreement § 1.1 at 2, emphasis added).  The drafters of the LLC Agreement could have expressly limited the future assignment of causes of action and choose not to.  Thus, the assignments by HTI and Khan are not barred by the Plan or the LLC Agreement.

Defendants' second point is that since the Plan and LLC Agreement did not grant BC Liquidating the authority to accept causes of action from HTI and Khan, those documents cannot now be amended to give Plaintiff that power.  (Elman Reply Mem. at 3).  This argument is mooted by the Court's finding that the assignments were authorized by the Plan and LLC Agreement as written.

Defendants' third point is that regardless of whether assignments from third parties were authorized in general, the definition of "Causes of Action" set forth in section 1.21 of the Plan and the use of the imperative, "shall", in that definition specifically excludes "direct claims from Lenders" from the realm of Causes of Action that could *ever* be assigned to BC Liquidating. Section 1.21 of the Plan defines "Causes of Action" as "all claims . . . , causes of action, third-party claims, counterclaims and crossclaims of any kind or nature which may be brought by or for the benefit of the Debtor, the Estate, or their creditors (other than direct claims belonging to any Lender)…; *provided, however,* that the term 'Causes of Action' *shall not* include the Sale Claims or any direct claims belonging to any Lender." (Plan Art. I § 1.21, emphasis added). The Defendants place much emphasis on the word "shall" and would have this Court interpret the use of the imperative to mean that BC Liquidating could never take assignment of a direct Lender claim.  However, read in conjunction with Article V(C) of the Plan which effectuates the assignment of the Causes of Action to the Plaintiff, the Court finds that a more reasonable interpretation of the definition of Causes of Action to be that the direct claims of Lenders were not to be assigned *under the Plan.*  The Court is also persuaded that this is the correct reading of the document in light of the fact that there is no language in the Plan or LLC Agreement that specifically *precludes* assignment of Lender causes of action at a later date.  The Court will not read any such limitation into the Plan especially in light of the stated purpose of BC Liquidating, which is to maximize recoveries for all creditors of this estate.

> ii.    *HTI and Khan assigned their claims and causes of action to BC Liquidating*

Defendants argue that even if BC Liquidating has the authority to bring the Lender Causes of Action, there was never any actual assignment.  In its opposition to the Elman

Defendants' motion to dismiss, the Plaintiff cites to Docket #s 348 and 349 in the main bankruptcy case docket, as documentation of the assignments. However, Docket #s 348 and 349 reflect the assignment of proofs of claims from HTI and Khan to BC Liquidating. This transfer of proofs of claim *against the estate* is different from an assignment of the Lender Causes of Action *against the Defendants*.

At the hearing on September 8, 2014, Plaintiff's counsel explained that in addition to those specific documents assigning the proofs of claim against the Debtor, HTI and Khan also signed a General Assignment of Claims – which effectuated the assignment of the Lender Causes of Action against the Defendants. Plaintiff's explanation at the hearing and the disclosure of the General Assignments was a revelation both to the Court and the Defendants' counsel.[7] Those General Assignments have now been docketed at #s 110 and 111 on the main case docket. Under these General Assignments, Khan and HTI assigned "all causes of action and claims" that arise or are related to the facts and circumstances set forth in the *In re BC Funding LLC* bankruptcy case that the party "had, has or now may have against the estate of BC Funding, LLC, its officers, directors, members, mangers, professionals, employees, agents, successor and/or any third parties." (General Assignments of Claims by HTI, Dkt. 110, at 1; General Assignments of Claims by Khan, Dkt 111, at 1). Both of the General Assignments of Claims are notarized and dated March 12, 2014.

It appears that the Plaintiff's earlier failure to disclose and docket the General Assignment of Claims Agreement was an oversight. The Complaint, at paragraphs 34 and 35,

---

[7]     Given the late disclosure of the General Assignments, the Elman and Weinstein Defendants have questioned their authenticity. However, unless and until the Defendants produce evidence that the General Assignments were falsified the Court will assume their validity.

specifically references the March 12, 2014 assignments.[8]  The language in the General

Assignments is clear and includes a transfer from HTI and Khan of all their causes of action—

against BCF, its affiliates, and third parties—to BC Liquidating.  These General Assignments

operate as a proper assignment of the Lender Causes of Action to BC Liquidating.


### iii.    The assignments were timely

Defendants argue that even if BC Liquidating has the authority to bring the Lender

Causes of Action and the assignments themselves were valid, the assignments were not timely

under the Plan.  They point to Article II(D) of the Plan which states that "Claims may be

transferred, sold, or assigned pursuant to the procedures set forth in Bankruptcy Rule 3001;

*provided, however*, that the transfer, sale or assignment of Claims shall only be permitted up

until and through thirty (30) days after Effective Date." (Plan Art. II(D), emphasis in original).

The Effective Date of the Plan was February 25, 2013 (Notice of Occurrence of Effective Date

of Amended Plan of Liquidation – Dkt.  No.  228).  This means that the General Assignment of

Claims, which occurred on March 12, 2014 did occur outside of that 30-day window.

However, it is important to look at the definition of "Claim" in the Plan.  Section 1.23 of

the Plan defines a "Claim" as "any claim(s) against the Debtor."  Article II(D)—titled

Transferability of Claims—includes no language that would indicate that the drafters intended to

use the term "Claim" in a manner different than as defined in section 1.23.  This means that only

claims *against the Debtor* are subject to the 30-day deadline.  Since the assignments at issue in

the case do not involve assignment of claims *against the Debtor*, but rather the assignment of

---

[8]        "On or about March 12, 2014, HTI [Khan], as assignor, duly assigned to Plaintiff as assignee, and
all rights, interests, cause of action and claims it had or has against the estate of BCF, BCF's officers,
directors, members, managers, professional, employees, agent, successors and assigned and/or any third-
party."

HTI and Khan's claims against third parties related to the Debtor – they are not subject to the 30-day time period of Article II(D).

### c.   *The Wagoner Rule and in pari delicto*

The Weinstein Defendants, Elman Defendants, Muhlstock Defendants, Karen Sharf and HASG argue that the Lender Causes of Action and the Debtor Causes of Action are barred by the *Wagoner* Rule which receives its name from and is set forth in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), and its progeny ("*Wagoner*" or "the *Wagoner* Rule"). Specifically, they argue that since Sharf was the CEO and alleged "mastermind" of the fraud on BCF his misconduct is imputed to the corporation, and since the Plaintiff stands in the shoes of the corporation the Plaintiff cannot bring the Lender Causes of Action and the Debtor Causes of Action under the *in pari delicto* doctrine as applied in the bankruptcy context by the *Wagoner* Rule.  (Weinstein Motion to Dismiss, May 21, 2014, Dkt 40, at 8; Elman Motion to Dismiss, April 11, 2014, Dkt. 14, at 6-9; Karen Sharf Motion to Dismiss, June 27, 2014, Dkt 69, at 21-24). In addition, the Defendants contend that the exceptions to *Wagoner*—the insider and adverse interest exception—do not apply.

Plaintiff argues that the Lender Causes of Action are not barred by *Wagoner* because the estate is bringing these claims on behalf of the creditors, HTI and Khan, and not on behalf of the Debtor, BC Funding.  (Plaintiff's Opposition to Weinstein Defendants' Motion to Dismiss ("Plaintiff's Opposition, Dkt# 83) at 14).  In addition, Plaintiff contends that the Debtor Causes of Action, which Plaintiff brings as an assignee of BCF, fall under both the insider and adverse interest exceptions to the *Wagoner* Rule.  (Plaintiff's Opposition, Dkt #83 at 14, 22).

For the reasons that follow, the Court holds that the *Wagoner* Rule does not defeat the Plaintiff's standing to pursue either the Lender Causes of Action or the Debtor Causes of Action.

Standing is a jurisdictional issue under Article III of the Constitution. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471-76 (1982). The doctrine of standing "incorporates both constitutional and prudential limitations on federal court jurisdiction." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000). The prudential limitations of standing "are 'judicially self-imposed limits on the exercise of federal jurisdiction,' ... and exist to preserve 'the proper—and properly limited—role of courts in a democratic society.'" *McHale v. Citibank, N.A.*, 420 B.R. 178, 192 (Bankr. S.D.N.Y. 2009) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 91 (2d Cir.2009) and *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (other citations omitted)).

Included among the prudential limits to standing in the Second Circuit is the so-called *Wagoner* Rule, which draws from the doctrine of *in pari delicto*. The *Wagoner* Rule and the doctrine of *in pari delicto* are distinct, with the former being a standing doctrine and the latter an affirmative defense that arises when both the plaintiff and defendant are equally at fault. *In re Allou Distributors, Inc.,* 387 B.R. 365, 392-93 (Bankr. E.D.N.Y. 2008). Courts in this Circuit have consistently adhered to the *Wagoner* Rule as a limitation on standing, despite the fact that many other Circuits do not follow this approach, but rather treat the *in pari delicto* doctrine as an affirmative defense. *McHale v. Citibank, N.A.*, 420 B.R. at 197 (other citations omitted). Although the *Wagoner* Rule and the doctrine of *in pari delicto* are distinct, for the purpose of this argument they will be analyzed together.

*Wagoner* stands for the proposition that "a claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty

corporation." *Wagoner*, 944 F.2d at 120.  This is an extension of *in pari delicto* which is effectively a policy that no one should be "permitted to profit by his own fraud or to take advantage of his own wrong, or to found a claim on his inequity, or to acquire any rights by his own crime." *In re Parmalat Sec. Litig. v. Bank of America Corp.*, 383 F. Supp. 2d 587, 596 (S.D.N.Y. 2005) (quoting *Byers v. Byers,* 223 N.C. 85, 25 S.E.2d 466, 469–70 (1943)).  Simply put, "the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010).  It takes effect through the principal of agency, where "the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight*, 219 F.3d at 86.  This means that any wrong done by a principle or employee of the company is imputed to that company, and the company cannot then exert a claim with regard to that activity.  It is, however, only applicable in the context of suits against third parties, usually professionals, where the defendant in conjunction with management damaged the company.  As discussed further below, it does not apply in cases where the third party defendant caused damages to the company through its own actions, without the complicity of management.

      *i.*        *The Lender Causes of Action*

      As discussed above, the Lender Causes of Action were properly assigned to the Plaintiff by HTI and Khan.  Thus the Plaintiff is bringing the Lender Causes of Action not stepping into the shoes of BCF, but stepping into the shoes of those creditors.  As such, the alleged bad acts of BCF's management are not imputed to the Plaintiff with respect to the Lender Causes of Action and the *Wagoner* Rule does not apply to bar Plaintiff's standing to pursue those claims.

ii.    *Debtor Causes of Action*[9]

The Debtor Causes of Action are being brought by Plaintiff by virtue of an assignment of those claims from BCF under the Plan.  As such the Plaintiff must accept all of the impediments that may come along with those causes of action – including the *Wagoner* Rule and *in pari delicto*.  However, the Court finds that since the Debtor Causes of Action – i.e., for conversion, aiding and abetting conversion, unjust enrichment, constructive trust, and accounting – do not involve fraud or complicity on the part of BCF, the *Wagoner* Rule does not apply. [10]  In order for the *Wagoner* Rule to apply, and thus bar suit, the complaint must allege that the company, or an officer whose actions are imputed to the company, actively engaged in wrongful conduct with the Defendants.  Courts have held that the *in pari delicto* defense, and thus *Wagoner*, only apply if the corporation or its agents were "an active, voluntary participant" in the alleged wrongdoing. *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLP*, 14-cv-2197VM, 2014 WL 3402602 at *3 (S.D.N.Y. July 9, 2014).

The difference is perhaps best highlighted by examining the case where *in pari delicto* was first applied as a standing doctrine. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), involved a company, HMK, wholly owned by Kirschner, which was violating Connecticut law by making improper sales. *Wagoner*, 944 F.2d at 116.  When HMK filed bankruptcy, the trustee sued Shearson, the trading floor where HMK made its trades. *Id.* The allegation was that Shearson knew that HMK was making improper trades and "manipulated" HMK into making such trades. *Id.* at 117.  There were two causes of action

---

[9]     Defendants only challenge Plaintiff's standing with regard to some of the Debtor Causes of Action; namely conversion, aiding and abetting conversion, unjust enrichment, constructive trust, and accounting.
[10]    The Court recognizes the inconsistency of pleading fraud with the involvement of BCF's management, as stated in the Lender Causes of Action, and at the same time pleading a fraud on the company without the involvement of management, as stated in the Debtor Causes of Action.

asserted in that complaint, but as the court explained only one of the two was barred. The second cause of action, which was a claim for fraud based on the actions of HMK's "sole stockholder and decision maker," Kirschner, was dismissed for lack of standing. *Id.* at 119-20. However, the first cause of action, that Shearson "churned" the HMK accounts, was not barred because that cause of action could have occurred through breach of contract as well as fraud and did not require any wrongdoing or fraud on behalf of the company. *Id.* at 119.

The Debtor Causes of Action for conversion, aiding and abetting conversion, unjust enrichment, constructive trust, and accounting do not require that the company itself engaged in any wrongdoing or fraud. Instead they rely on the actions taken by the Defendants themselves, namely that the Defendants personally harmed the company by stealing funds (conversion and accounting), improperly benefited at the company's expense (unjust enrichment), or conducted a transfer that financially hurt the company and requires restitution (constructive trust). The Plaintiff could bring these causes of action even without proving the existence of an overarching conspiracy or scheme since at its heart these are effectively claims that the Defendants stole from BCF. Unlike claims for fraud that require a relationship between the company and the defendant, the Debtor Causes of Action do not require that the company or its officers conspired together or assisted each other. The Defendants could have, as the Complaint alleges, misappropriated funds for bogus consulting contracts and work never completed with or without the presence of an overarching scheme. This is similar in many respects to *MF Global*, where the court found that the allegations against PwC for malpractice and negligence were not barred by *in pari delicto. MF Global*, 2014 WL 3402602 at *3-5. The key in that case was that the claims for malpractice and negligence focused on alleged improper advice that PwC gave to MF Global and on which MF Global detrimentally relied. The claims did "*not* arise out of the active,

voluntary acts of MF Global employees" and so *in pari delicto* did not bar the claims.  *Id*. at 4

(emphasis added).  The Debtor Causes of Action in this case are analogous as they also do not

require any wrong doing or complicity on behalf of BCF or its officers.

In light of the Court's finding that the *Wagoner* Rule does not apply to the Debtor Causes

of Action, the Court will not address the parties' arguments as to whether the adverse interest

and sole actor exceptions to the *Wagoner* Rule apply.

2. *Motions to Dismiss*

The Defendants also seek to dismiss each cause of action of the Complaint for failure to

state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6)

("Rule 12(b)(6)"), made applicable to this adversary proceeding by Federal Rule of Bankruptcy

Procedure 7012, and/or for failure to satisfy the pleading requirements of Federal Rules of Civil

Procedure 8 and 9 ("Rule 8" and "Rule 9", respectively), made applicable to this adversary

proceeding by Federal Rules of Bankruptcy Procedure 7008 and 7009.

A motion to dismiss for failure to state a cause of action under Rule 12(b)(6) requires a

determination of whether the complaint properly states a claim under Rule 8.  *See* Fed. R. Bankr.

P. 7008.  Under Rule 8, a complaint must contain a "short and plain statement of the claim

showing the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009).  In *Iqbal*

and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), the Supreme Court emphasized two

principles which form the basis for determining a Rule 12(b)(6) motion.  First, the tenet that a

court must "accept all factual allegations as true" is limited to factual allegations, and does not

apply to legal conclusions. *Iqbal,* 556 U.S. at 668.  "While legal conclusions can provide the

complaint's framework, they must be supported by factual allegations.  When there are well-

pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 676. Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* The Supreme Court has explained that "[t]he plausibility standard is not akin to a probability requirement, but asks for more than a sheer possibility" to demonstrate that the defendant is liable for the alleged misconduct. *Id.*

Determining whether a complaint states a plausible claim is "context specific, requiring the court to draw on its experience and common sense." *Ashcroft,* 556 U.S. at 668. However, the "pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008). A complaint has facial plausibility when "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 668.

Additionally, courts must "draw inferences ... in the light most favorable to the [nonmovant], and construe the complaint liberally." *In re Dreier LLP.*, 452 B.R. at 476 (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (other citations omitted)). Finally, "courts must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). A court may even consider a document that has not been incorporated by reference "'where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.'" *Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)*, 374 B.R. 113, 119 (Bankr. S.D.N.Y. 2007) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (other citations omitted)).

The Rule 9 pleading standard applies to claims that allege fraud. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005). The heightened pleading standards of Rule 9 require that fraud is stated with "particularity" and

"'allege with some specificity the acts constituting fraud. . . '" *In re Actrade Fin. Techs. Ltd.* (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.,* 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)).  However, where a bankruptcy trustee is the party alleging the fraud the Second Circuit has adopted "'a more liberal view ...  since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.'" *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (quoting *Nisselson v. Softbank AM Corp. (In re Market XT Holdings Corp*.), 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (other citations omitted)).

The Court will address the sufficiency of the pleadings and the plausibility of the claims with respect to each count of the Complaint, in turn.

    *a.  Counts 1 and 2 – RICO Claims*

In Counts 1 and 2 of the Complaint, the Plaintiff seeks civil damages of $7 million from the Weinstein Defendants, the Elman Defendants, the Muhlstock Defendants, and Karen Sharf and HASG ("RICO Defendants") under 18 U.S.C. § 1962(c) and (d) for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Section 1962(c) of the RICO statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.  § 1962(c).

In order to plead a RICO claim, a complaint "must demonstrate, as to each defendant, that while employed by or associated with an enterprise engaged in interstate or foreign commerce, and through the commission of at least two predicate acts constituting a "pattern of

racketeering," the defendant directly or indirectly conducted or participated in the conduct of the affairs of such enterprise." *Gross v. Waywell*, 628 F. Supp. 2d 475, 485 (S.D.N.Y. 2009).

The Plaintiff here alleges that each of the RICO Defendants engaged and participated in a fraudulent unlawful scheme to elicit more than $7 million from numerous investors. (Compl. ¶ 206). The RICO Defendants allegedly conducted such activity by falsely representing the financial status of BCF through incorrect audits, executive summaries, and periodic financial statements. (Compl. ¶ 206). In addition, the RICO Defendants allegedly used the United States mail and wire transfers to funnel this money into shell companies, trust entities, and attorney escrow accounts so that they could then distribute the fraudulently obtained funds. (Compl. ¶ 206). The RICO Defendants also allegedly worked "in concert and with distinct roles" operating as an "enterprise" as defined in 18 U.S.C. §§ 1964(4) and 1962. (Compl. ¶ 207). The Complaint further alleges that each of the RICO Defendants violated 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1956 (money laundering), 1857 (engaging in monetary transactions in property derived from specified unlawful activity), and 1952 (racketeering). (Compl. ¶ 220). These activities are examples of racketeering activity and their alleged continued use constitutes a pattern of racketeering activities within the meaning of 18 U.S.C. § 1961(5). (Compl. ¶¶ 221-23).

Specifically, the Plaintiff alleges that the Muhlstock Defendants manipulated the financial statements of BCF and certified false audits that were used to induce individuals to invest in BCF; the Elman Defendants used the Muhlstock audits to solicit funds from investors for BCF and then laundered those funds; the Weinstein Defendants used attorney escrow accounts to illegally accept and transfer BCF funds; and Karen Sharf and HASG both laundered and took funds from BCF for personal use. (Compl. ¶¶ 209-12).

Taking all material facts as alleged in the Complaint as true, the Court finds that the Plaintiff has adequately pled plausible RICO claims.

*i.       Existence of, and Participation by RICO Defendants in, an Enterprise*

Under 18 U.S.C. § 1961(4) an "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity and any union or group of individual associated in fact although not a legal entity."  Importantly, "the Second Circuit has construed enterprise liberally, noting that RICO's 'language and history suggest that Congress sought to define the term as broadly as possible…'" *Aiu Ins. Co. v. Olmec Medical Supply Inc*, CV-04-2934 ERK, 2005 WL 3710370 at *6 (E.D.N.Y. Feb. 22, 2005).  Such an enterprise can be demonstrated by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). One type of RICO enterprise, and the one alleged by Plaintiff here, is an "association-in-fact enterprise" which requires (i) a purpose; (ii) relationships among the individuals associated with the enterprise; and (iii) longevity sufficient to permit the associates to pursue the purpose of the enterprise." *Boyle v. United States,* 556 U.S. 938, 946 (2009).

However, even if the Plaintiff has sufficiently alleged the existence of a criminal enterprise, the Supreme Court has held that liability only attaches when the defendant "participate[s] in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).  At the pleading stage, the "operation or management test typically had proven to be a relatively low hurdle for plaintiff to clear." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (emphasis original) (citations omitted). Indeed, "RICO liability is not limited to those with primary responsibility, nor to those with a

formal position in the enterprise, but some part in directing the enterprises affairs is required…" *Aiu Ins. Co.*, 2005 WL 3710370 at *8 (citing *Reves*, 507 U.S. at 179). RICO liability thus does not only attach to upper management but is "also applicable to lower rung participants." *Metro. Transp. Auth. v. Contini*, No. 04-CV-0104 DGTJMA, 2005 WL 1565524 at *4 (E.D.N.Y. July 6, 2005).

The Court holds that the Plaintiff has with sufficient particularity alleged the existence of a criminal enterprise. The Complaint lays out that the purpose of the enterprise was to elicit investments that while ostensibly for the operation of the business of BCF were really intended to be used by Sharf and the other Defendants for their personal gain. (Compl. ¶ 206). These funds were procured by giving investors, such as Khan and HTI, fraudulent information. (Compl. ¶¶ 157-58, 186, 196-98). Once BCF had the funds, those same funds were "misappropriated, directed, and laundered" to "shell companies, trust entities, and attorney escrow accounts to obtain and distribute fraudulently obtained funds with the intent to conceal the full extent of the scheme." (Compl. ¶ 206).

The Court further holds that the Plaintiff has adequately alleged that there was a sufficient relationship among the RICO Defendants to qualify the scheme as an enterprise. Other courts have held that an enterprise exists where there is a leader and the other defendants share "familial or business relationships." *Elsevier, Inc. v. Grossman*, No. 12 Civ. 5121 KPF, 2013 WL 6331839 at *9 (S.D.N.Y. Dec. 5, 2013) (court found that all Defendants were involved in a criminal enterprise where the Defendants purchased individual subscriptions at a discount and then gave those subscriptions to the leader of the conspiracy who then resold them). In the case at hand, the Plaintiff alleges that the RICO Defendants each aided Sharf in some manner: the Elman Defendants by allegedly helping to defraud Khan, as well as laundering funds through

allegedly phony consulting contracts (Compl. ¶ 127); the Weinstein Defendants by distributing and laundering the alleged stolen BCF funds through TWG's escrow account (Compl. ¶¶ 86-106); the Muhlstock Defendants for allegedly knowingly preparing and distributing fraudulent audits in order to conceal any wrongdoing by Sharf thus making the company appear more attractive to investors (Compl. ¶¶ 84-86); and Karen Sharf, along with HASG, for allegedly assisting in laundering and hiding funds improperly acquired from BCF.  (Compl. ¶ 75).

Accepting these allegations as true, this combination of activities from all of the alleged participants is sufficient to allege a criminal enterprise for the purposes of defrauding investors. The Court also holds that there is sufficient longevity to the enterprise since the Plaintiff alleges that the fraud began in 2007 and continued until at least 2011.  (Compl. ¶ 65).

Defendants' citation to *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89 (S.D.N.Y. 1993), is unavailing as that case is factually distinct.  In *Gelt Funding*, the court found that the plaintiff had not shown the existence of an enterprise because the plaintiff did not allege "how the members were associated together" and that it was "at worst" a "series of discontinuous independent frauds." *Id.* at 98.  The fraud in *Gelt Funding* involved an association of mortgage brokers who engaged in unrelated loan transactions.  This differs from the case at hand.  Here, the Plaintiff has specifically alleged how the different participants interacted to carry out one scheme.  Namely that the Defendants worked together to acquire funds from outside investors for BCF, used those funds for their personal use, and then attempted to conceal the use of the misappropriated funds.  These are not unrelated transactions as was the case in *Gelt Funding*.

All of the RICO Defendants claim that the Plaintiff has not adequately alleged that they "controlled," "conducted" or "participated, directly or indirectly, in the conduct of such

enterprise affairs." (Weinstein Motion to Dismiss at 14, Elman Motion to Dismiss at 11, Karen Sharf Motion to Dismiss at 10, Muhlstock Motion to Dismiss at 15-18). Specifically that since Sharf "solely dominated BCF" and "he alone" controlled its business and operations; there is no way that the other parties could have had any control. At the pleading stage, the Court holds that the Complaint sufficiently alleges that the RICO Defendants were involved in a criminal enterprise under RICO and had sufficient control. Although Sharf was the CEO and alleged mastermind of the fraud, the Plaintiff alleges that the RICO Defendants still played a substantial role in directing the enterprise's affairs: Weinstein had an official role in the company as one of the Managers of BC Holdings, the parent company of BCF (Compl. ¶ 55); Weinstein, in his capacity as a manager of BC Holdings, signed Sharf's Employment Agreement (Compl. ¶ 57); and Weinstein, as sole owner of TWG, directed and executed the flow of money from the company's escrow account to himself and Sharf for their personal benefit. (Compl. ¶¶ 87-118). In addition the Plaintiff alleges: Elman arranged for the meeting with Khan where he and Sharf convinced Khan to invest in BCF (Compl. ¶¶ 161-63); Elman took an active role both before the meeting—sending Khan documents he knew to be untrue—and at the meeting, where he specifically relayed information to Khan about a default rate for BCF that he knew to be false (Compl. ¶¶ 165-67, 173-77); Karen Sharf demonstrated control when she directed the transfer of BCF assets through TWG's escrow account to pay for personal expenses such as their son's bar mitzvah. (Compl. ¶¶ 75, 97-102). The Plaintiff further alleges that such actions can be imputed to HASG because that company is wholly owned by Karen Sharf and Barry Sharf. (Compl. ¶ 20). The Plaintiff also alleges: the Muhlstock Defendants created and conveyed false financial statements to make BCF appear more profitable and to spur further investment. (Compl. ¶¶ 145-59, 173-79); and the Muhlstock Defendants were responsible for concealing the fraudulent

transfers to the Defendants to ensure that the fraud continued. (Compl. ¶¶ 84-86). These allegations sufficiently allege that the Defendants directly participated in the alleged criminal enterprise. It is the allegations and not the proof that are relevant at this stage of the pleadings, and the Court finds that the allegations of the Complaint in this regard are sufficient to withstand the motions to dismiss.

Karen Sharf and the Muhlstock Defendants argue that HASG and Muhlstock & Associates are distinct "professional service providers" and so cannot be found to have exerted sufficient control under *Reves*. (Karen Sharf Motion to Dismiss at 10; Muhlstock Motion to Dismiss at 18). However, *Reves* did not provide blanket protection for professionals. *Reves* only gave protection to certain activities of accountants and other professionals, not *all* activities they conducted. *JSC Foreign Econ. Ass'n Technostroyexports v. Weiss*, No. 06 Civ. 6095 JGK, 2007 WL 1159637 at *8 (S.D.N.Y. April 18, 2007) ("However, *Reves* provides no blanket immunity for professionals regardless of their involvement in a criminal enterprise"). The Complaint here alleges that the Muhlstock Defendants were not acting as outside accountants, but as co-conspirators, when they purposefully falsified the audits. In addition, Karen Sharf's argument presupposes that HASG is even a professional service provider. The Plaintiff alleges that HASG is not a consulting company but is actually a shell company for Sharf to deposit and hide funds stolen from BCF. (Compl. ¶ 74). Plaintiff supports these allegations by pointing to the absence of any written agreement between the Debtor and HASG, or any 1099s or invoices provided by HASG to justify their expenses. (Compl. ¶¶ 70-74). Since the Plaintiff specifically alleges that HASG and Muhlstock & Associates were not "professional service providers," but rather were active participants in the conspiracy they are not granted protection under *Reves*.

The RICO Defendants' citation to *Lima LS PLC v. PHL Variable Ins. Co.*, No. 3:12–cv–1122 WWE, 2013 WL 3327038 (D. Conn. July 1, 2013), is also unavailing since the court in that case dismissed the RICO claims for failure to discuss "specific allegations as to actual acts specific to each of the individual defendants." *Id*. at 11. Here, the Plaintiff does allege specific acts, as discussed above, with regard to how each individual defendant was involved in the alleged fraud. Such allegations are specific enough to survive a motion to dismiss.

The Muhlstock Defendants also cite to *Gilmore v. Berg*, 820 F. Supp. 179 (D. N.J. 1993), where the court ruled that a false tax opinion and forecast letter did not constitute participation in RICO. However, *Gilmore* was adjudicated on a summary judgment rather than a motion to dismiss. In addition, the court's reasoning in *Gilmore* focused on how the activities conducted by the defendants were "all common professional services typically rendered by attorneys for their business clients." *Id*. at 183. Here though, the alleged fraudulent activities taken by the Muhlstock Defendants, falsifying audits and purposefully concealing transfers, could not have been part of their routine accounting services. (Compl. ¶¶ 150-54, 188-91, 84-87). The facts in this case are similar to the facts of *JSC Foreign Economic Association Technostroyexport*, 2007 WL 1159637 at * 9. There the court held that the accountants were not protected since they were the "architect" of the money laundering and were providing services outside of their accounting role. *Id*. Here, the Complaint makes similar allegations as to the Muhlstock Defendants, separating their alleged bad acts from that of normal accountants.

In conclusion, the Court finds that the Plaintiff has adequately alleged the existence of, and the RICO Defendants' participation in, a criminal enterprise. As with all of the allegations made by the Plaintiff, these allegations remain to be proven at trial.

*ii.*    *Pattern of Racketeering*

The RICO Defendants contend that Plaintiff failed to plead with particularity any of the five predicate acts of racketeering, namely mail fraud, wire fraud, money laundering, engaging in monetary transactions improperly derived from specified unlawful activity, and racketeering. Specifically, with regard to the claim of mail and wire fraud they argue that the Complaint fails to adequately plead any clam of personal knowledge or intentional participation in the alleged fraud.  In addition, the RICO Defendants argue that there is nothing in the Complaint that demonstrates any fraudulent intent or instances of misrepresentations to investors.  The RICO Defendants also dispute Plaintiff's claim of money laundering since it is only based on "a cursory allegation upon information and belief."

To establish a claim for mail or wire fraud, a plaintiff must prove "(1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme**,** and (3) the use of the interstate mails or transmission facilities in further of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996).  The Court finds that the Complaint pleads, even under the heightened pleading standard of Rule 9(b), with sufficient and specific facts that the RICO Defendants engaged in mail and wire fraud.

The first element of mail or wire fraud, a scheme to defraud, is judged by a "nontechnical standard" that is a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing." *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (citations omitted).  The Complaint sufficiently alleges a scheme to defraud through specific allegations concerning each of the RICO Defendants.  These include allegations that Weinstein transferred funds from the escrow accounts to benefit himself and Sharf; that Elman met with Khan to solicit funds for a failing BCF; that HASG was a shell company used by Karen Sharf to deposit BCF funds that

were fraudulently raised from outside investors; and that the Muhlstock Defendants falsified

BCF's audits and purposefully mislabeled transfers out of the company to make BCF look more

financially attractive than it really was. (Compl. ¶¶ 84-118, 123-44, 150-54, 161-86, 188-91).

The second element of mail or wire fraud, intent, does not itself need to be stated with

particularity. While the fraud itself must be stated with particularity, "[m]alice, intent,

knowledge and other condition of mind of a person may be averred generally." *Wight*, 219 F.3d

at 91. As the Second Circuit explained, "a plaintiff realistically cannot be expected to plead a

defendant's actual state of mind." *Id.* (citations omitted). In addition, "courts generally evaluate

averments of fraud in the bankruptcy context more liberally than in other civil actions charging

fraud." *In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 21 (Bankr. E.D.N.Y. 2006). Due to

the difficulties of being able to accurately plead a defendant's intent, courts allow scienter to be

plead by "identifying circumstances indicating conscious behaviors by the defendant, though the

strength of circumstantial allegations must be correspondingly greater." *Powers v. British Vita,*

*P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995). One method to demonstrate motive is through receipt

of funds. *Mezzonen, S.A. v. Wright*, No. 97 CIV. 9380 LMM, 1999 WL 1037866 at *9 (S.D.N.Y.

Nov. 16, 1999) (Court held that defendants "alleged receipt of funds shows motive, and his role

of providing valuations shows opportunity").

The Court finds that the Plaintiff has sufficiently alleged the RICO Defendants' scienter

through their specific acts, including the receipt of funds from the fraud. These alleged specific

acts include: Weinstein's alleged transfers from the escrow account that he controlled to Sharf

for Sharf's personal use and the presence of two sets of books, allegedly for the purpose of

concealing the transfers (Compl. ¶¶ 87-114); Elman's alleged misrepresentations to Khan, both

before and at their meeting, convincing him to invest $500,000.00 into BCF and Elman's receipt

of funds for consulting which he allegedly never engaged in (Compl. ¶¶ 161-86); Karen Sharf's direction of funds from the escrow account to pay for her and Sharf's personal expenses (Compl. ¶¶ 97-102); and BCF's payment to the Muhlstock Defendants of $15,250.00 in 2008 and $19,910.00 in 2009 for their services creating allegedly false audits.  (Plaintiff's Opposition to Muhlstock Motion to Dismiss, Aug. 18, 2014, Dkt. 87, 88, Exhibit A, B, C, and D).  With regard to the Muhlstock Defendants, the Plaintiff references e-mails between them and Sharf, and alleges that the Muhlstock Defendants made changes to the audit only after asked to by Sharf in order to disguise compensation paid by BCF.  (Plaintiff's Opposition to Muhlstock Motion to Dismiss, Exhibit A and B).  Reading the Complaint in the light most favorable to the Plaintiff, and accepting the factual allegations as true, the Court finds that the Complaint adequately alleges that the RICO Defendants had sufficient intent under RICO.

The Muhlstock Defendants rely on *Chill v. Gen. Elec. Co.,* 101 F.3d 263 (2d Cir. 1996). However, *Chill* involved a securities lawsuit rather than a RICO action and focused on how a "generalized" motive by the defendant of desiring their investment to appear profitable did not meet scienter requirements.  *Id.* at 268.  Here the Plaintiff has not alleged a "general" motive but a very specific one, monetary gain.  The RICO Defendants also cite *Laro, Inc. v. Chase Manhattan Bank (Nat. Ass'n),* 866 F. Supp. 132 (S.D.N.Y. 1994), for the proposition that the court should assume that the defendant is acting in their own self-interest when determining intent.  However, the court decided *Laro* on a summary judgment motion after "extensive" discovery.  *Id.* at 137.  On a motion to dismiss, before the opportunity for any discovery, the Court holds that the Plaintiff has sufficiently alleged that the RICO Defendants were motivated to conspire with Sharf and the other Defendants in order to earn their fees, commissions, or other payment.

The third element of mail or wire fraud, the use of the interstate mails or transmission facilities in furtherance of the scheme, can be shown by "a master plan to defraud, ... a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications." *Mezzonen, S.A.*, 1999 WL 1037866 at *7.  This means that the Plaintiff need only plead the master plan with particularity and not every instance of wire or mail fraud.

Here, the Court holds that the Plaintiff sufficiently and particularly pled that the RICO Defendants were each part of the master plan to defraud.  As discussed above, the Plaintiff alleges that Weinstein used the escrow account to transfer funds to benefit Sharf personally and then into his own consulting company, BeeSwing Consulting.  (Compl. ¶¶ 87-107).  In addition, the Plaintiff alleges the existence of two sets of books suggesting that Weinstein was attempting to prevent discovery of the transfers and obscure their real purpose (Compl. ¶¶ 108-13).  The allegations against Elman include that he conducted wire transfers in furtherance of a conspiracy to take funds from BCF for his and Sharf's pecuniary gain, and that Elman used mail and wires to communicate with Khan to send him inaccurate audits, fraudulent business plans, and incorrect information about the company in an effort to ensure that he invested.  (Compl. ¶¶ 145-200).  In addition Elman is alleged, through mail and wire, to have received weekly consulting payments totaling $340,551.46 and eight (8) interest free loans from BCF to TIX, the alleged purpose of these payments being to divert and launder funds from BCF.  (Compl. ¶¶ 124-43).  Plaintiff alleges that Karen Sharf, using both mail and wire, directed the transfer of funds from the escrow account to pay for personal expenses and accepted funds from the escrow account for HASG (Compl. ¶¶ 20, 75, 97-102, 110).  In addition, Plaintiff alleges that the Muhlstock Defendants falsified audits and purposefully hid and misclassified transfers out of the company to make BCF appear more financially stable than it truly was.  (Compl. ¶¶ 150-54, 188-91, 83-

86).  These allegations are sufficient at the pleading stage to demonstrate a master plan to commit mail and wire fraud.

The Complaint also sufficiently alleges that the RICO Defendants engaged in money laundering as defined under section 1956 of title 18.  Section 1956(a)(1)(A) makes it an offense to knowingly conduct or attempt to conduct a financial transaction that involves the proceeds of an unlawful activity "with the intent to promote the carrying on of specified unlawful activity." Additionally, section 1956(a)(1)(B)(i) makes it an offense to engage in a financial transaction "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  Money laundering claims under RICO are "assessed under the less stringent 'notice pleading' requirements of Rule 8(a)."  *Eastman Kodak Co. v. Camarata*, No. 05-CV-6384L, 2006 WL 3538944 at *7 (W.D.N.Y. Dec. 6, 2006).

With regard to the Weinstein Defendants, Plaintiff alleges that they made fraudulent transfers from the escrow account to Sharf and used two sets of books, a "sanitized" escrow analysis and an "unredacted" escrow analysis, to escape detection.  (Compl. ¶¶ 89-114).  The use of two sets of books supports the allegation that Weinstein knew that the transfers were unlawful and was attempting to conceal or disguise their nature.  In addition, the Plaintiff alleges that Elman used TIX as a shell company to funnel BCF funds and that the purpose of the eight interest free loans was to launder those funds.  (Compl. ¶¶ 124-44).  The absence of any documentation about what "consulting" TIX did or the purpose of the loans is sufficient to support the allegation that Elman "knowingly conduct[ed]..  a financial transaction with the proceeds of some form of unlawful activity."  18 U.S.C. § 1956(a)(1)(B)(i).  The Complaint also alleges that HASG was a shell company used by Karen Sharf to deposit BCF funds that were fraudulently raised from outside investors.  (Compl. ¶¶ 70-76).  In addition, the Muhlstock

Defendants were allegedly also responsible for concealing fraudulent transfers to third parties in order to ensure that the fraud continued. (Compl. ¶¶ 84-86). These allegations, when taken in the light most favorable to the Plaintiff, are sufficiently plead with regard to the money laundering prong of RICO.

The RICO Defendants rely on *Potter v. Retail Automation Products, Inc.*, No. 13 Civ. 4506 GBD, 2014 WL 494521 at *2 (S.D.N.Y. Feb. 5, 2014), to demonstrate that the allegations that are based upon information and belief fail to meet the standard of Rule 9(b). However, the plaintiff in *Potter* was not a bankruptcy trustee or estate representative as we have here, and thus the more liberal bankruptcy pleading standard did not apply in that case. Also, the court in *Potter* dismissed the case because the "Plaintiff [] failed to allege any *specific* facts to support his allegation." *Id.* (emphasis added). That is not true in this case. As detailed above, the Plaintiff has alleged numerous specific transactions engaged in by the RICO Defendants.

### iii.    *Continuity*

The Court also finds that the Plaintiff has sufficiently alleged continuity with regard to the racketeering acts described above. Continuity may be satisfied by a showing of either "open-ended continuity" or "closed-end continuity." *H.J., Inc .v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241-42 (1989). The Complaint sufficiently pleads both.

Closed-ended continuity is shown by demonstrating a "series of related predicate acts extending over a substantial period of time." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 42 (2d Cir. 1999). Closed-ended continuity is primarily a temporal concept and although there is no bright line rule the Second Circuit has never held that a period of less than two years constitutes a sufficient time period for closed-ended continuity. *Spool*, 520 F.3d at

184.  The relevant period for close-ended continuity reflects the "time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Id*.  However courts also look at additional factors such as "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes." *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001).

Here, the Complaint sufficiently alleges closed-end continuity with respect to each of the Defendants—including Karen Sharf, HASG, and the Muhlstock Defendants—by describing a scheme to defraud investors that existed for a period of well over two years.  For example, the Plaintiff alleges that there were transfers of at least $1,033,073.57 to HASG from 2007 to 2011. (Compl. ¶ 72).  Since HASG is fully controlled by Karen Sharf, the allegations against HASG apply to her as well.  Additionally, the Complaint alleges that the Muhlstock Defendants participated in the scheme to defraud through their creation of the 2008 and 2009 audits, both of which were used by BCF for more than two years to solicit investments.  (Compl. ¶¶ 84-86, 151-55, 199).

Alternately, the Court finds that the Plaintiff has adequately alleged open-ended continuity.  Open-ended continuity exists "even if the predicate acts were not engaged in over an extended period of time.  Instead, there must be a threat of continuing criminal activity 'extending indefinitely into the future.'" *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 79-80 (E.D.N.Y. 2006) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989)).  The court must look to the nature of the conduct or the enterprise itself to see if the racketeering acts will be considered continuing.  *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995).  If "the nature of conduct or the enterprise does not by itself suggest that the

racketeering acts will continue, courts must look to external factors" to see if the actions are likely to continue into the future. *Id.*

The Plaintiff sufficiently alleged a continuing scheme that only ended when BCF filed bankruptcy. All of the RICO Defendants allegedly participated in the fraud from its inception in 2007 providing false information or laundering funds in order to continue the fraud by acquiring new infusions of money from investors. (Compl. ¶¶ 75, 84, 108, 143). The Plaintiff further alleges that Sharf was continuing to use false information to solicit investments from 2008 to 2011, and it is plausible that the fraud would have continued. (Compl. ¶¶ 158, 199).

Thus, the Plaintiff has alleged both close-ended and open-ended continuity sufficient to survive the motions to dismiss.

### iv.    Proximate Cause

The Court finds that the Complaint sufficiently alleges that the RICO Defendants' actions were the proximate cause of the Lenders' injuries. A plaintiff alleging a RICO claim has to show that its injuries were caused by the defendants' racketeering activities; this is a "but for" cause standard. *De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 310 (S.D.N.Y. 2013) ("To state a civil RICO claim, a plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well"). This means that the plaintiff must demonstrate "that an enterprise's acts of racketeering 'were a substantial factor in the sequence of responsible causation' and that the plaintiff's injury 'was reasonably foreseeable or anticipated as a natural consequence.'" *Tymoshenko v. Firtash*, No. 11-CV-2794 KMW, 2014 WL 4851825, at *7 (S.D.N.Y. Sept. 30, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003).

The Muhlstock Defendants argue that the Plaintiff has not adequately alleged proximate cause. However, the Complaint does allege that but for the misleading audits generated by the Muhlstock Defendants, Khan, HTI, and other investors, would not have provided funds to BCF. (Compl. ¶¶ 157, 186). This is alleged by the Complaint's depiction of Khan as a sophisticated investor, demonstrated by his detailed questions to Sharf and Elman about pending litigation, loan subordination, and BCF's cash position. (Compl. ¶¶ 184-85, 194). Considering the sophistication of these questions, the Complaint implies that if no audit had been provided Kahn would not have invested. The same can be said of Alpert, who only invested an additional $560,000.00 after he received the 2008 audit. (Compl. ¶¶ 150-57). It is also not only reasonably foreseeable that Alpert and Khan would invest after seeing the fraudulent audits but that the audits themselves would be provided to them. The only purpose in creating false financial statements, as the Plaintiff alleges the Muhlstock Defendants did, is to attempt to misrepresent the financial state of BCF in order to raise additional funds to keep the fraud going. With that purpose in mind, the idea that prospective investors would see the false audits and rely on them is both reasonably foreseeable and an anticipated consequence of the Muhlstock Defendants' alleged creation false audits.

The Muhlstock Defendants' reliance on *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), is misplaced. The Court's reasoning in *Hemi Group*, where the RICO claim was dismissed, explicitly relied on the "attenuated" connection between the defendant's actions and the resulting injury. The alleged fraud here, and the role of the fraudulent audits created by the Muhlstock Defendants, is not nearly so attenuated. As discussed above it is reasonably foreseeable that false audits created to further a fraud, as Plaintiff alleges, would be given to prospective investors and would be instrumental in ensuring that they did in fact invest. The

Complaint in fact specifically alleges that HTI reinvested and Khan invested only after receiving these false audits. (Compl. ¶¶ 145-98).

The Court finds that the Plaintiff has specifically alleged the existence of, and participation by each of the RICO Defendants in, the criminal enterprise; sufficiently alleged at least two predicate acts of racketing for each of the RICO Defendants; as well as sufficient continuity and proximate damage. The Court finds that the Plaintiff has stated a plausible claim upon which relief can be granted, and thus will deny the motions to dismiss the RICO claims.

Count 2

Under section 1962(d), to demonstrate a RICO conspiracy claim a plaintiff must prove "'the existence of an agreement to violate RICO's substantive provisions.'" *Cofacredit*, 187 F.3d at 244 (quoting *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)). Because the Court has already held that Plaintiff has adequately alleged the RICO claims, the Court denies the motions to dismiss the conspiracy claims.

b.  *Count 3 – Fraud*

The Plaintiff has asserted a common law fraud claim against the Elman Defendants. Under New York Law, the essential elements for fraud are: (1) a representation or omission of a material existing fact; (2) falsity; (3) scienter; (4) justifiable reliance on the misrepresentation or omission; and (5) injury. *York Union v. Continental Ins. Co*, 622 N.E. 2d 763, 769 (1995). The Court finds that the Plaintiff has sufficiently alleged a plausible cause of action for fraud. The Plaintiff alleges that: the Elman Defendants made repeated material representations to investors - including the Executive Summary, the 2008 audit, and the 2009 audit (Compl. ¶¶ 165-81, 235);

these representations were demonstrably false; (Compl. ¶¶ 168, 175, 177-78, 180, 189-90, 236); Elman and TIX knew that these representations were false (Compl. ¶¶ 177, 189, 237); Khan justifiably relied on the misrepresentations or omissions when deciding to invest, since such information was vital to demonstrating the viability of BCF (Compl. ¶ 238); such reliance led to injury since it was as a direct result of those misrepresentations Khan invested $1,000,000.00 (Compl. ¶¶ 158, 186, 197, 239).

The Elman Defendants' argument that the fraud allegations are not particular enough or that BCF itself did not suffer damage is not persuasive. (Elman Motion to Dismiss at 21). This cause of action is brought on behalf of HTI and Khan who, as explained above, have properly transferred their claims and causes of action to the Plaintiff. If this claim is proven HTI and Khan, as the allegedly defrauded parties, were surely damaged in that the alleged fraud caused them to lose over two million dollars combined. In addition, the Court holds that the cause of action is pleaded with sufficient particularity with regard to Elman himself. The Complaint specifically alleges that it was Elman who brought in Khan to convince him to invest in BCF, and it alleges numerous specific instances at the meeting and over e-mail where Elman allegedly misrepresented BCF's financial status. (Compl. ¶¶ 162, 165-81). These allegations are sufficient to withstand a motion to dismiss and the motion will denied with respect to the claim for fraud.

    c.   *Count 4 – Aiding and Abetting a Fraud*

The Court finds that the Complaint sufficiently pleads a plausible claim against the Weinstein Defendants, the Elman Defendants, Karen Sharf, HASG, and the Muhlstock Defendants for aiding and abetting the fraud. To state a claim for aiding and abetting fraud, a plaintiff must plead facts showing: (1) the existence of a fraud; (2) defendant's knowledge of the

fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001). The Defendants argue that the Complaint does not sufficiently allege actual knowledge or substantial assistance through particularized enough facts, and improperly lumps all the Defendants together. For the reasons that follow, these arguments fail.

The Complaint clearly alleges the existence of a fraud that extends beyond just defrauding Khan and HTI, and includes allegations of both the dispersal and hiding of assets in shell companies and escrow accounts. The Plaintiff specifically alleges all of these different parts of the scheme, beginning with the allegations of how the Defendants mislead HTI and Khan with false audits, incorrect financial statements, and allegedly distorted information about the company. (Compl. ¶¶ 145-98). Then once the funds from the investors were received by BCF, Sharf, with assistance from the Defendants, allegedly looted the company and attempted to prevent discovery by depositing the stolen funds into trust entities, escrow accounts, shell corporations and consulting companies. (Compl. ¶¶ 60-107).

The Complaint also sufficiently pleads that all of the Defendants had actual knowledge of the fraud. Weinstein allegedly transferred funds from his attorney escrow account to directly pay for personal benefits to Sharf such as his son's bar mitzvah. (Compl. ¶¶ 68-69, 82-83, 87, 89-102). Weinstein also allegedly caused BCF to pay a consulting company he owned, BeeSwing Consulting, over $30,000.00 (Compl. Re Decl. Exh. 5). In addition, Weinstein allegedly kept two sets of books for the escrow account – a fact which, the Plaintiff alleges, shows that he knew about the dubious nature of the transfers. (Compl. ¶¶ 109-17). As alleged in the Complaint, the Muhlstock Defendants knew about the fraud because they knew the audits they created were false (Compl. ¶¶ 152, 188-89), and the only reason to create such incorrect audits was to make

BCF appear more attractive for investors. The Plaintiff alleges that Elman had personal knowledge of the fraud because Elman allegedly made numerous misrepresentations about the financial strength of BCF to Khan, with the specific intent to have Khan invest money in BCF in furtherance of the fraud. (Compl. ¶¶ 161-81). Karen Sharf also allegedly knew about the fraud since she directed the funds from the escrow account to pay for personal expenses and to HASG for work that allegedly was never performed. (Compl. ¶¶ 66-75, 89-102).

In addition, the Complaint adequately alleges substantial assistance by each of the Defendants: Weinstein allegedly operated the escrow fund which he used to hide transfers and directed part of those funds to his own consulting company (Compl. ¶¶ 92-107); Elman allegedly received large payments for his own alleged consulting work while making misrepresentations to Khan in order to have him invest in a scheme where that investment would be looted by the Defendants (Compl. ¶¶ 125-27); Muhlstock allegedly created false financial statements for the explicit purpose of luring in outside investors (Compl. ¶¶ 151-52, 188-89); and Karen Sharf allegedly directed funds from the escrow account to pay for personal services and ran a shell corporation, HASG, whose purpose was to conceal transfers from BCF in order to perpetuate the fraud. (Compl. ¶¶ 66-75). The Court finds that these allegations were made with sufficient specificity and that the Complaint alleges, at times, exact dates and dollar amounts. The Court also finds that the Complaint does not lump the Defendants together; instead it describes the fraud as a mosaic produced by the Defendants, where the fraud could only exist due to each of their individual actions. According to the Complaint, each of the Defendants' actions were vital for the fraud to continue. Although all of these allegations remain to be proven at trial, the Court finds the allegations to be sufficient at this preliminary pleading stage.

>    d.    *Count 5, 6, 8 – Breach of Fiduciary Duty and Aiding and Abetting Breach of*
>          *Fiduciary Duty*

>                        i.    *Breach of Fiduciary Duty*

Plaintiff brings a claim for breach of fiduciary duty against the Weinstein Defendants and

Elman; and a claim for aiding and abetting a breach of fiduciary duty against the Weinstein

Defendants, the Elman Defendants, the Muhlstock Defendants, and Karen Sharf and HASG.

The Court finds that the Complaint sufficiently alleges claims for breach of fiduciary

duty against both the Weinstein Defendants and Elman, and that those claims are entirely

plausible when the factual allegations of the Complaint are accepted as true.  The Plaintiff

alleges: Weinstein is a manager of BC Holdings which is the parent company of BCF (Compl. ¶

53); it was in that capacity that Weinstein signed the employment agreement for Sharf (Compl. ¶

57); due to his position as manager Weinstein owed a fiduciary duty to BCF and to HTI;

Weinstein and TWG as general counsel for BCF also owed fiduciary duties to BCF and HTI

(Compl. ¶ 61).  The Plaintiff alleges that:  Elman served as Special Counsel, Advisory Board

member, and Vice President of BCF (Compl. ¶¶ 22, 167); and his fiduciary duties included

prohibitions on self-dealing and profiting individually at the expense of BCF.  The Complaint

sufficiently alleges that the Defendants breached these duties.

The Weinstein Defendants' argument that an attorney only has a duty to distribute the

escrow funds in accordance with his client's instructions is unavailing.  (Weinstein Motion to

Dismiss at 27).  The Plaintiff alleges that Weinstein's responsibilities at BCF went beyond

simply being a lawyer since he was a Manager of BC Holdings and this additional role indicates

that Weinstein had fiduciary responsibilities.  The Plaintiff sufficiently alleges that Weinstein

transferred funds from BCF's escrow account for Sharf's and his own personal gain, violating

his fiduciary duty.  Elman also allegedly violated his fiduciary duties by transferring at least

$340,551.16 to his consulting firm from BCF for work that allegedly was never performed. (Compl. ¶ 127).

## ii. Aiding and Abetting Breach of Fiduciary Duty

In order to assert a claim for aiding and abetting a breach of fiduciary duty under New York law a plaintiff has to plead three elements: (i) a breach of fiduciary obligations, of which the aider and abettor had actual knowledge; (ii) the defendant knowingly induced or participated in the breach; and (iii) the plaintiff suffered damages as a result of the breach**.** *In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005)**.** At the motion to dismiss stage, the Court finds that the Plaintiff has sufficiently pled that the Defendants aided and abetted Sharf in his breach of fiduciary duty to BCF.

The Plaintiff alleges that both Sharf and Weinstein owed fiduciary duties to both BCF and HTI, through HTI's status as a member of BC Holding, BCF's parent. Each of the Defendants, as alleged above, participated in the fraud with Sharf. The alleged fraud involved Sharf looting BCF, which violated his fiduciary duty to BCF. Taking all of the allegations of the Complaint as true, the Defendants' alleged assistance in that fraud demonstrates their participation in Sharf's breach of his fiduciary duty. Plaintiff also sufficiently alleges that BCF suffered damages of at least $7 million based on misappropriated investments in BCF, even if the Plaintiff cannot yet determine where all the funds went. (Compl. ¶ 68, 69, 82, 83, 94, 127, 289). The Plaintiff will have to prove these damages at trial, but at this stage in the case the Court finds the Plaintiff's allegations as to damages to be sufficient.

The Defendants argue that the "[p]laintiff offers only conclusory assumptions with respect to actual knowledge" which are insufficient under New York law. (Muhlstock Motion to

Dismiss at 40).  However, with all reasonable inferences being made in favor of the Plaintiff, there are numerous specific factual allegations to demonstrate that the Defendants assisted Sharf in perpetuating this alleged fraud.  These allegations include that Elman made material representations to investors (Compl. ¶¶ 165-81, 235); that the Muhlstock Defendants created false 2008 and 2009 audits, inflating gross revenue and net income for the purpose of acquiring further investment (Compl. ¶¶ 177-79, 189-92, 236); and that Weinstein transferred escrow funds from BCF to benefit Sharf and himself, as well as to shell companies such as HASG, controlled by Karen Sharf, for work that was never completed (Compl. ¶¶ 66-75, 92-107).

The Muhlstock Defendants' citation to *In re Parmalat Sec. Litig*, 501 F. Supp. 2d 560 (S.D.N.Y. 2007), with respect to the unforeseeability of damages is also unpersuasive.  In *Parmalat*, the court explained that it is not foreseeable that misrepresenting a company's financials will "cause a subsidiary with which the defendant has no contact to enter into a transaction of which the defendant has no knowledge and that the subsidiary subsequently will be injured when the proceeds are up streamed to the parent and looted by its corrupt insiders."  *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d at 580.  However, the court also found that "*it is reasonably foreseeable* that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm." *Id*.  (emphasis added).  In this case, it is entirely foreseeable that financial statements created by an accountant would be used to induce prospective investors to provide funds to the company, and if those financial statements are inaccurate damages to both the company and the investor will ensue.

The Court will deny the Defendants' motions to dismiss the aiding and abetting fraud claims.

*e.    Count 9 and Count 10 – Conversion Aiding and Abetting Conversion*

The Plaintiff brings claims for conversion and aiding and abetting conversion against the Weinstein Defendants, the Elman Defendants, Karen Sharf and HASG.

To state a claim for conversion under New York law, a plaintiff must show that "someone intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that persons' right of possession." *Colavito v. N.Y. Organ Donor Network Inc.*, 8 N.Y.3d 43, 49-50 (2006). "Money, if specifically identifiable, may be the subject of a conversion action." *Weisberg v. Smith*, 401 F. Supp. 2d 359, 362 (S.D.N.Y. 2005). "Identifiable funds" include named bank accounts as long as the recovery is for a "particular and definite sum of money." *ADP Investor Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*, 390 F. Supp. 2d 212, 224 (E.D.N.Y. 2005).

Here, the Plaintiff alleges exact accounts and amounts transferred to each of the Defendants. This includes at least $340,551.16 allegedly transferred from BCF's operating account to TIX. (Compl. ¶ 127). The Complaint also alleges that Karen Sharf, through her ownership of HASG, received at least $1,033,073.57 from BCF. (Compl. ¶¶ 68-75). In addition, the Plaintiff alleges that Weinstein and TWG received and transferred at least $700,000 from BCF. (Compl. ¶¶ 87-107, Exhibit D). All of these are considered identifiable funds which support a claim of conversion.

Defendants cite to *Krasner v. Rahfco Funds LP*, No. 11 CV 4092 VB, 2012 WL 4069294, at *8 (S.D.N.Y. Aug. 9, 2012) for the proposition that a claim of conversion must always require demand on part of the plaintiff. However, as the Second Circuit said in *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49-50 (2d Cir. 1996),

which *Krasner* relied on, "where the defendant holds the property unlawfully—where, for example, he stole the property—'no demand and refusal are necessary to render the defendant liable.'" *Id*. at 49-50 (quoting *Nat Koslow, Inc. v. Bletterman*, 23 Misc.2d 340, 343, 197 N.Y.S.2d 582, 586 (Sup. Ct. N.Y. Cty. 1960)). Plaintiff's allegation here that the funds themselves were effectively stolen removes the need for demand.

The Plaintiff also sufficiently alleges an action for aiding and abetting conversion. As explained above, the Plaintiff has sufficiently alleged that the Defendants engaged in the conversion of funds. The Complaint also alleges that the Defendants assisted each other in that conversion by operating together. The Defendants correctly point out that the Plaintiff must plead the defendants' "actual knowledge." However, this can be discerned from surrounding circumstances. *See Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014). The surrounding circumstances, as described by the Complaint, are sufficient to allege that each of the Defendants had conscious knowledge of the scheme to defraud and their role in it. The Elman Defendants' knowledge can be inferred since they allegedly were hired to provide capital raising services even though they had no experience, and subsequently did not render any such services or maintain 1099's or invoices. (Compl. ¶¶ 124-26, 133-34). Karen Sharf, through HASG, allegedly received funds totaling $1,033,073.57 with no explanation or relevant documents and invoices to describe what consulting work she or HASG did. (Compl. ¶¶ 68-75). Weinstein allegedly transferred hundreds of thousands of dollars from an escrow account he controlled to personally benefit Sharf as well as into a consulting company he owned. (Compl. ¶¶ 92-107). At the pleading stage these allegations are sufficient to plead claims for conversion and aiding and abetting conversion, and the Court finds that such claims are entirely plausible assuming the

factual allegations of the Complaint to be true. Therefore the Court will deny the motions to dismiss with respect to conversion and aiding and abetting conversion.

### f.    Count 11 – Unjust Enrichment

The Plaintiff brings claims for unjust enrichment against the Weinstein Defendants, the Elman Defendants, Karen Sharf and HASG. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). The Defendants argue that the unjust enrichment claims are duplicative of the aiding and abetting fraud claims, and must be dismissed. However, the Court finds that the Plaintiff's unjust enrichment claim is distinct from the breach of fiduciary duty claim. The breach of fiduciary duty claim stems from alleged participation by the Defendants in Sharf's diversion of BCF assets. The unjust enrichment claim focuses on the funds BCF paid for "consulting services" to Weinstein/TWG, Elman/TIX, and Karen Sharf/HASG that were allegedly never performed. Since the Plaintiff has sufficiently alleged payment for non-existent consulting services, and alleged that the payments were fraudulent, requiring restitution, the Court will deny the motions to dismiss with respect to the unjust enrichment claims.

### g.    Count 12 – Constructive Trust

Plaintiff brings a claim for constructive trust against the Weinstein Defendants, the Elman Defendants, Karen Sharf and HASG. The elements of a constructive trust claim are "(1) a confidential or fiduciary relation, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment." *BNP Paribas Mortg. Corp. v. Bank of Am.,*

*N.A.*, 949 F. Supp 2d 486, 515 (S.D.N.Y. 2013). However, the exact circumstances that bring about a constructive trust are broad and "a constrictive trust will be erected whenever necessary to satisfy the demands of justice." *Simond v. Simonds*, 45 N.Y.2d 233, 241 (1978). And so "courts impose constructive trusts even when one or more of the elements have not been met." *Reale v. Reale*, 485 F. Supp. 2d 247, 251 (W.D.N.Y. 2007).

The Defendants assert that any funds they received were actually "payment for services rendered." (Weinstein Motion to Dismiss at 35). This may ultimately be found to be true, but this is a defense to be proven at trial. Such a defense is not an appropriate basis to dismiss a complaint under Rule 9 or Rule 12 at the pleading stage of a case.

The Court finds that the Complaint sufficiently pleads a claim for constructive trust with respect to each of the Defendants. The Plaintiff has specifically alleged that the existing fraud provides a sufficient reason in "the demands of justice" to impose a constructive trust. Assuming all factual allegations in the Complaint to be true, the Court finds that the Plaintiff has sufficiently pled that the funds received by the Defendants were for improper purposes and the Court will deny the motions to dismiss the constructive trust claims.

> *h.   Count 13 – Accounting*

Plaintiff brings a claim for accounting against all of the Defendants. An accounting is proper if there is a "trust or fiduciary relationship…or where special circumstances are present warranting equitable relief in the interest of justice." *Grossman v. Laurence Handprints-N.J., Inc.*, 90 A.D.2d 95, 104, 455 N.Y.S.2d 852 (N.Y. App. Div. 1982). The Court finds that the Plaintiff has alleged that each of the Defendants either had a trust or fiduciary relationship with BCF, or that "special circumstances" would warrant this equitable relief "in the interest of

justice."  In this case, the Plaintiff clearly alleges that the Debtor's property was misappropriated

by the Defendants.  If ultimately proven, then an accounting is in order.  The Court will deny the

motions to dismiss the request for an accounting.


      *i.*    *Count 14 and 30 – Preferential transfers*

      Plaintiff seeks to avoid allegedly preferential transfers made to the Elman Defendants and

the Weinstein Defendants under 11 U.S.C. § 547.  Section 547 provides:

**(b)** Except as provided in subsections (c) and (i) of this section, the trustee may avoid any
transfer of an interest of the debtor in property—
    **(1)** to or for the benefit of a creditor;
    **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was
    made;
    **(3)** made while the debtor was insolvent;
    **(4)** made—
        **(A)** on or within 90 days before the date of the filing of the petition; or
        **(B)** between ninety days and one year before the date of the filing of the petition,
        if such creditor at the time of such transfer was an insider;


      The Plaintiff alleges that between March 12, 2011 and March 13, 2012, TIX, Elman and

LOME received payments of $91,770.00 from the Debtor.  (Compl. ¶ 317).  In addition, Plaintiff

alleges that between those same dates, Weinstein and TWG received payments of $307,632.81

(Compl. ¶ 436).  As discussed above, the Plaintiff sufficiently alleges, for purposes of a motion

to dismiss, that Elman was an insider based on his purported role as Vice President and as special

counsel.  (Compl. ¶¶ 22, 167).  Plaintiff also pled that Weinstein is an insider due to his role as a

manager of BC Holdings and his role through TWG as general counsel.  (Compl. ¶¶ 18, 53, 61).

As an alleged insider, this means that under section 547 a one-year reach back period for

preferences is used.  These payments fall within that statutory time period for a preferential

transfer to an insider.

The Defendants' argument that Plaintiff did not allege with enough particularity the specific transfers at issue goes beyond what is required at this preliminary stage of the proceedings.  Rule 8(a), which applies to preference claims, requires a short and plain statement of the claim.  Fed. R. Bankr.P. 7008.  A complaint also has to "give the defendant sufficient notice to prepare an answer, frame discovery, and defend against the charges." *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 111 (Bankr. S.D.N.Y. 2011).  Here, the Plaintiff has met this standard by alleging each of the elements of the claim and the facts to support these elements, thus giving appropriate notice of the transfers to which they are referring.  Thus the Court holds that the motions to dismiss the preference claims will be denied.

### j.    Count 15-24, 31-35 – Fraudulent Transfers

The Plaintiff also seeks to avoid certain transfers as fraudulent conveyances pursuant to 11 U.S.C. §§ 548(a)(1)(B), 548(a)(1)(A), 544(b), 550, and New York Debtor Creditor Law §§ 273, 274, 275, 276, 276-a, 278 and/or 279.  Under the Bankruptcy Code the reach back period for fraudulent transfers is two years. 11 U.S.C. § 548(a)(1).  Under New York law, incorporated through section 544(b) of the Code, the reach back period is six years. *Mendelsohn v. Nat'l Westminster Bank, USA. (In re Frank Santora Equip. Corp.)*, 256 B.R. 354, 372 (Bankr. E.D.N.Y 2000).

The Plaintiff brings these claims against the Elman Defendants, Karen Sharf, HASG, and the Weinstein Defendants alleging that the "consulting work" by these Defendants did not provide any value to BCF.  (Compl. ¶¶ 72, 107, 134).  The Complaint also alleges that the subject transfers were made within six years prior to the Debtor filing for bankruptcy. (Compl. ¶¶ 330, 367, 449).

The Defendants' arguments that the funds being transferred to their respective companies or accounts were their own rather than BCF's, and that they provided value to BCF in exchange for the transfers, are defenses that are not properly raised at the motion to dismiss stage. At the pleading stage the Plaintiff has sufficiently alleged that any payments made to the Defendants was done within the six years prior to bankruptcy, for no equivalent value. Alternatively, the Plaintiff has sufficiently alleged that the transfers made to the Defendants were done with the actual intent to "hinder, delay, and defraud" existing or future creditors. Thus, the Defendants' motions to dismiss the fraudulent transfer claims will be denied.

*k.*   *Count 36 – Disallowance of all claims*

In light of the Court's holding that none of the claims asserted in the Complaint should be dismissed at the pleading stage, the motions to dismiss with respect to disallowance are denied.

## CONCLUSION

For all of the foregoing reasons, the motions to dismiss filed by the Weinstein Defendants, Karen Sharf, HASG, the Elman Defendants and the Muhlstock Defendants will be denied. An Order consistent with this Decision will issue forthwith.



**Dated: Central Islip, New York**
**October 31, 2014**

**Robert E. Grossman**
**United States Bankruptcy Judge**